937 A.2d 949

TOWNSHIP OF MIDDLETOWN, PLAINTIFF–RESPONDENT, AND PETER LYNCH AND CLIFFORD RAISCH, PLAINTIFFS–IN-TERVENORS, v. RICHARD SIMON, TRUSTEE AND JEFFREY JERMAN, DEFENDANTS–APPELLANTS, AND LAMBERTO BUILDERS, L.L.C., DEFENDANT.

Argued September 11, 2007—Decided January 15, 2008.

*Paul H. Schafhauser* and *Keith A. Bonchi* argued the cause for appellants (*Herrick, Feinstein,* attorneys for Richard Simon, Trustee and *Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill,* attorneys for Jeffrey Jerman).

*Bernard M. Reilly* argued the cause for respondent (*Dowd & Reilly,* attorneys).

*Michael J. Fasano* submitted a brief on behalf of *amicus curiae,* New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz,* attorneys).

*Michael J. Convery* submitted a letter in lieu of brief on behalf of intervenors-respondents (*Convery & Convery,* attorneys).

Justice WALLACE, JR., delivered the opinion of the Court.

In 1929, the owners of land adjacent to Shadow Lake in Middletown Township subdivided the land into fifty-six numbered residential lots and one unnumbered lake-front lot labeled "Park." The subdivision map was presented to the Township and recorded in 1932. Many years later, the Park lot was assessed as a separate lot for tax purposes. Because the owners of the Park lot were unknown, taxes on the lot were not paid. Subsequently, the Township sold several tax sale certificates on the lot. A purchaser of a tax sale certificate successfully foreclosed on the property, obtained title to the Park lot, and contracted to sell it to a construction company for the construction of a residence.

The Township filed a complaint against two of the certificate holders and the contracted construction company, asserting that the Park lot was dedicated to the Township for public use and that conversion of the parcel to private use would violate the rights of the public in the dedicated property. Following cross motions for summary judgment, the trial court concluded that the Township

did not have a dedicated interest in the property and granted judgment in favor of defendants. On appeal, the Appellate Division reversed, holding that the "recording of the subdivision map and subsequent sale of residential lots with reference to that map constituted an irrevocable dedication of the lot for public use as a park." *Twp. of Middletown v. Simon*, 387 *N.J.Super.* 65, 77, 903 *A.*2d 418 (2006).

We granted certification to determine whether the issuance of a tax sale certificate and a successful foreclosure action by the certificate holder prevent a municipality from subsequently accepting the lot as dedicated. We agree with the reasoning of the Appellate Division that the Park lot was dedicated land and that the sale of the tax sale certificate and the subsequent foreclosure on the lot did not prohibit the Township from later accepting the dedication of the land as a park. We conclude, however, that under the circumstances presented, a remand is necessary for the court to fix an amount of reimbursement due to defendants.

I.

A.

Elmer and Nellie Alexander owned a parcel of land adjacent to Shadow Lake in Middletown Township. In December 1929, the Alexanders presented a subdivision map to the Township, and the Township Committee of the Township of Middletown approved the map on December 12, 1929. The map depicted fifty-six numbered residential lots and one unnumbered lot designated "Park." Approximately one-half of the fifty-six numbered residential lots and the Park lot had direct access to Shadow Lake, while the remaining lots did not. The map was recorded with the Monmouth County Clerk on April 26, 1932. The status of the 1.08–acre Park lot is the focus of this dispute.

Elmer died in January 1932. Prior to 1938, Nellie, his widow, sold two lots, one to Stanley Haviland in October 1933 and one to Charles Green in November 1936. Both transactions referenced

the filed map for Shadow Lake Park. In June 1938, Nellie entered into an agreement (the 1938 Agreement) with Haviland, Green, and the bank holding a mortgage on portions of Nellie's property. The 1938 Agreement set forth certain restrictions applicable to twenty-one of the lots in the subdivision and made two references to a park. One reference specifically mentioned the lot marked "Park" on the map and read as follows:

> The drive known as Alexander Drive and the place known as Sunrise Place and the road known as Orchard Road and the parcel of land marked "Park" on the said map, shall at all times hereafter, *until the care and maintenance thereof shall be taken over by the municipality be* cared for and maintained by [Nellie Alexander], her heirs and assigns.
>
> [ (emphasis added).]

The other reference was in an introductory paragraph that limited the running of the restrictions with the land until July 1, 1962. It provided that *"no street, roads, avenues, parks or any other land is intended to be dedicated to public use* by reference thereto or by reference to the said map." (emphasis added).

Following the 1938 Agreement, Nellie conveyed other lots in Shadow Lake Park to various purchasers. However, the 1938 Agreement was only expressly mentioned in two of the deeds between 1938 and 1956. Still, most of the conveyances referenced the 1929 map that depicted the unnumbered Park lot, and at least one deed expressly conveyed the lot "[t]ogether with the right to use, in common with others, the park and Shadow Lake."

Neither Nellie nor her heirs ever conveyed the Park lot. At some unknown time, for tax purposes, the Township joined the Park lot to the adjacent lot 17. In 1988, a tax assessor became aware that the Park lot was improperly attached to lot 17 when the owner of that lot prepared to sell it. The Township then uncoupled the Park lot from lot 17 and gave it a separate tax designation. The owners of the Park lot were listed as unknown.

For the next two years, no taxes were paid on the Park lot. As a result, on November 28, 1990, the Township sold a tax sale certificate on the lot to Jeffrey Jerman. A second certificate was sold to Joyce Bussey on December 6, 1991, and a third to Richard

Simon on June 23, 1995. Thereafter, Simon paid the taxes on the Park lot.

In July 2000, Simon filed a tax foreclosure action (the Foreclosure Action) seeking to obtain title to the Park lot. When a search of the records revealed that Clifford Raisch, the owner of lot 17, might have an interest in the Park lot, Simon joined him in the action. Raisch filed an answer asserting that the Township was an indispensable party to the Foreclosure Action because it held a continuing and irrevocable right to accept the Park lot for public use under the law of dedication. Simon moved to strike Raisch's answer. The trial court found that the original owners of the Park lot did not intend to dedicate it to the Township; therefore, the Township was not an indispensable party to the action. The trial court granted Simon's motion to strike Raisch's answer. Thus, the Township was not included as a party in the Foreclosure Action.

While the Foreclosure Action was pending, the Township's attorney, Bernard Reilly, wrote a letter to Simon dated March 6, 2003, explaining that homeowners in Shadow Lake Park claimed that the tax sale certificate issued on the Park lot was potentially erroneous. Reilly noted that the homeowners' association obtained a partial interest in the Park lot and might convey that interest to the Township, with the Township taking over the property and keeping it as a " 'park' or 'open space' in accord with the restriction on the Filed Map and various deeds." Reilly stated that the Township wanted "to avoid litigation over the tax status of the parcel" and sought Simon's "advice as to a possible negotiated compromise" in light of "the potential non-usability of the parcel for anything other than a 'Park' —— and the potential for litigation over this possible restriction."

Simon's attorney, Keith Bonchi, responded to Reilly's letter that Simon was not interested in selling his valid tax sale certificate and that the trial court had rejected a claim that the Park lot was dedicated public land. Further, Bonchi questioned whether the Township should be seeking to undermine the contractual relation-

ship it had with Simon as a result of Simon's purchase of the tax sale certificate from the Township.

On May 28, 2003, the trial court entered a final judgment in the Foreclosure Action in favor of Simon. None of the parties appealed from that judgment.

Approximately six months later, Simon agreed to sell the Park lot to Lamberto Builders, L.L.C., for the construction of a house. The closing on the sale was scheduled for May 28, 2004.

In January 2004, Reilly sent a letter to Bonchi again requesting that Simon consider the sale of the Park lot to the Township. Because the Park lot was under contract, Bonchi replied that he could not respond to the proposal, but that he would contact Reilly if, for some reason, the sale did not take place.

In May 2004, the Township instituted this action against defendants Simon, as Trustee, Jerman, and Lamberto Builders. The Township sought a declaration that the Park lot was a dedicated park in accordance with the approved subdivision map filed in 1932. Several homeowners in Shadow Lake Park joined in the action on behalf of the Township. While the action was pending, the Township passed an ordinance in September 2004, accepting the dedication of the Park lot as a public park. The ordinance provided in part that

N.J.S.A. 40:67-1(b) establishes that a municipality by Ordinance may formally accept any park dedicated to public use and, upon advice of the Township Attorney, this "park" parcel was irrevocably offered for dedication by the original developer and formal acceptance of that dedication by this Ordinance would assist in establishing and clarifying this "park" parcel as a Township accepted public park.

[Middletown Twp., N.J., Ordinance Ratifying/Authorizing Acceptance of Dedicated "Park" Parcel Block 1010 Lot 412 Shadow Lake Park (Sept. 20, 2004).]

The parties filed cross motions for summary judgment. The trial court rejected the Township's claim that the Park lot was dedicated to public use, noting that it agreed with the rejection of dedication by the trial court in the Foreclosure Action. The court granted judgment in favor of defendants dismissing the complaint. The Township appealed and the Appellate Division reversed.

B.

Because of our substantial agreement with the Appellate Division's reasoning, we quote liberally from Judge Skillman's opinion. The Appellate Division initially addressed whether the Township was barred from advancing its dedication argument under the doctrine of collateral estoppel because the dedication issue had previously been decided in the Foreclosure Action. *Twp. of Middletown, supra*, 387 *N.J.Super.* at 73–75, 903 *A.*2d 418.

In analyzing that issue, the panel noted that

[t]o foreclose relitigation of an issue based on collateral estoppel, "the party asserting the bar must show that (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding."

[*Id.* at 74, 903 *A.*2d 418 (quoting *Sacharow v. Sacharow*, 177 *N.J.* 62, 76, 826 *A.*2d 710 (2003)).]

The panel found that Simon established the first three elements and assumed, without deciding, that the Township was in privity with Raisch to satisfy the fifth element. *Ibid.* However, the panel found that the fourth element was not satisfied. *Ibid.*

The panel explained that, when a person dedicates a portion of land for public use, "the municipality [acquires] a continuing right to accept the dedication ... by official municipal action"; but, the municipality holds "no interest in the land" until it accepts the dedication. *Id.* at 75, 903 *A.*2d 418. The panel clarified that the dedicating party retains legal title "and continues to be liable for the payment of property taxes," although the tax assessment should "reflect [the] dedication ..., which may result in an assessment for only a nominal amount." *Ibid.*

The panel also discussed the interest obtained by the purchaser of a tax sale certificate who forecloses on the property. *Id.* at 75–76, 903 *A.*2d 418. The panel stated that the certificate holder "only acquires the fee interest in the land that was subject to taxes," *id.* at 75, 903 *A.*2d 418, and that once a party dedicates

property to public use, a subsequent party who "acquires title by a tax foreclosure action takes the property subject to the public use and the municipality's continuing right to accept the dedication," *id.* at 75–76, 903 *A.*2d 418. Applying those legal principles, the panel declared that "[t]he entry of a final judgment of foreclosure could only result in a transfer of title to the [P]ark lot, subject to the alleged dedication, just as would a voluntary conveyance to a third party." *Id.* at 76, 903 *A.*2d 418.

Bearing in mind those interests, the panel found that the fourth element required to foreclose relitigation of an issue was not satisfied because "it is clear that the determination whether the Alexanders dedicated the [P]ark lot for use as a park was not essential to the judgment in the tax foreclosure action." *Ibid.* Consequently, the panel concluded that collateral estoppel did not bar the Township's claim because all of the necessary elements for application of collateral estoppel were not satisfied. *Ibid.*

The panel then sought to determine whether the Alexanders did in fact dedicate the Park lot for public use in 1929. *Id.* at 76–79, 903 *A.*2d 418. The panel quoted *Highway Holding Co. v. Yara Engineering Corp.*, 22 *N.J.* 119, 125–26, 123 *A.*2d 511 (1956), for the principle that, "[w]hen lands are sold with reference to a map upon which lots and streets are delineated, there is a dedication of such streets to the public, and such dedication continues and cannot be revoked except by consent of the municipality." *Twp. of Middletown, supra,* 387 *N.J.Super.* at 76–77, 903 *A.*2d 418. The panel explained that " '[t]he same rule of dedication applies where the filed map contains an area or lot marked 'park.' ' " *Id.* at 77, 903 *A.*2d 418 (quoting *Brookdale Park Homes, Inc. v. Twp. of Bridgewater,* 115 *N.J.Super.* 489, 499, 280 *A.*2d 227 (Ch.Div.1971)). Because the Alexanders recorded the subdivision map and sold over twenty lots from 1932 to 1956 with specific reference to the 1929 subdivision map, the panel concluded that those acts "constituted an irrevocable dedication of the [Park] lot for public use." *Ibid.*

The panel found unpersuasive the trial court's reliance on the 1938 Agreement to find there was no intent to dedicate. *Id.* at 77–79, 903 *A.*2d 418. The panel recognized that the 1938 Agreement contained conflicting language; one section decreed that it was "agreed that no streets, roads, avenues, parks or any other land is intended to be dedicated to public use ... by reference to the [filed subdivision] map," while another section expressly stated that "the parcel of land marked 'Park' on the said map shall at all times hereafter, *until the care and maintenance thereof shall be taken over by the municipality* [,] be cared for and maintained by [Nellie Alexander], her heirs and assigns." *Id.* at 78, 903 *A.*2d 418 (alterations in original) (internal quotation marks omitted). The panel found that no matter what the Alexanders had intended in creating the 1938 Agreement, they "had already dedicated the [P]ark lot for public use by filing the subdivision map in 1932 and subsequently selling lots based on that map." *Ibid.* Further, the panel noted that virtually all of the deeds dated after 1938 fail to mention the 1938 Agreement, although those deeds did reference the 1929 subdivision map that showed the lot designated as a Park, thus reinforcing its conclusion that the Alexanders dedicated the Park lot for public use. *Id.* at 78–79, 903 *A.*2d 418.

The panel also rejected Simon's argument that levying taxes on the Park lot was evidence that the lot was not dedicated. *Id.* at 79, 903 *A.*2d 418. As it had noted, the panel did not find the acts of dedication and issuance of taxes (with corresponding tax sale certificates) to be mutually exclusive. *Ibid.* The panel concluded that once "the taxes were not paid, [the Township] had a right to issue a tax sale certificate" and the title when Simon acquired it "was subject to the dedication of the land for use as a park." *Ibid.*

Finally, the panel rejected as without merit the arguments that a judgment declaring the Park lot "dedicated to public use would undermine the effectiveness of the Recording Act, *N.J.S.A.* 46:15–1.1 to 46:26–1, and that the Township should be foreclosed by the doctrine of estoppel and laches from asserting such a dedication." *Id.* at 79–80, 903 *A.*2d 418. In rejecting defendants' estoppel and

laches arguments, the panel found "no inherent inconsistency between issuance of a tax sale certificate or entry of a tax foreclosure judgment on a lot and a municipality's assertion that the lot is dedicated to public use as a result of its designation for that use in a filed subdivision map." *Id.* at 80, 903 *A.2d* 418. Likewise, the panel disagreed with defendants' contention that it would be unfair to enforce the Township's late acceptance of dedication but still permit the Township to retain all the money defendants paid for the taxes. *Id.* at 80–81, 903 *A.2d* 418. The panel reversed the judgment and remanded to the trial court to enter "judgment declaring that the [P]ark lot is dedicated to public use as a park." *Id.* at 81, 903 *A.2d* 418.

We granted defendants' petition for certification, *Twp. of Middletown v. Simon*, 189 *N.J.* 426, 915 *A.2d* 1049 (2007), and granted amicus curiae status to the New Jersey Land Title Association.

## II.

Defendants argue that the Appellate Division failed to properly analyze the tax sale law in this State and the coincidental contractual relationship between Simon and the Township. Additionally, defendants submit that the panel overlooked the deed restrictions contained in the 1938 Agreement, which, defendants allege, explicitly signify an intent against public dedication of the Park parcel. Further, defendants urge that the sale of three tax sale certificates and the issuance of a building permit [1] contradict the Township's later decision to accept an offer of dedication. Finally, defendants contend that it is unfair to permit the Township to

---

[1] Although the record indicates that a building permit was issued in 1996, the record does not clearly establish who applied for or who received that permit. At that time, defendants merely owned tax sale certificates, which did not entitle either of them to receive a building permit. Our dissenting colleague uses the issuance of that building permit as a factor in support of equitable estoppel. Because defendants did not own the property in 1996 when the permit was issued, we find no basis to use that as a factor in considering defendants' equitable estoppel argument.

accept the offer of dedication and keep the money defendants paid for the tax sale certificate and the taxes on the lot, but leave defendants with bare legal title.

In contrast, the Township argues that the Appellate Division fairly addressed all of the issues and reached the right result. In opposition to defendants' unfairness argument, the Township contends that Simon is a sophisticated businessman aware of the risks involved in purchasing parcels of land; therefore, it is fair to leave him without reimbursement for the taxes he paid on the land.

Amicus, New Jersey Land Title Association, recognizes that the present New Jersey law tends to support many of the postulates of the Appellate Division, but urges this Court to find that policy concerns require that offers to dedicate be limited in duration rather than left open indefinitely. It also urges that the Township should be estopped from accepting the offer of dedication because the Township acted inequitably and because the judgment below is unfair and harsh to the innocent defendants.

### III.

Except for the remedy, we are in complete accord with the analysis of the Appellate Division. We affirm the portion of the judgment that approved the Township's acceptance of dedication of the Park lot for the reasons expressed in Judge Skillman's comprehensive opinion.

We add the following. We continue to adhere to our law of dedication. Dedication is "the permanent devotion of private property to a use that concerns the public in its municipal character." Roger A. Cunningham & Saul Tischler, *Dedication of Land in New Jersey*, 15 *Rutgers L.Rev.* 377, 377 (1961). Although originally used mostly for public highways, dedication law now applies to "bridges, squares, parks and recreational facilities, wharves and landing places, markets, schools, public buildings, and cemeteries." *Id.* at 378 (footnotes omitted).

 We have explained that, in determining whether the owner intended to dedicate land, "it is not the actual, unrevealed intention that controls, but rather the intention manifested by the acts or conduct of the dedicator." *Haven Homes, Inc. v. Raritan Twp.*, 19 *N.J.* 239, 246, 116 *A.2d* 25 (1955). We consider the acts or conduct at the time of the dedication, rather than at any time thereafter. "Generally speaking, ambiguities are resolved against the dedicator and in favor of the public." *Ibid.; accord Point Pleasant Manor Bldg. Co. v. Brown*, 42 *N.J.Super.* 297, 303–04, 126 *A.2d* 219 (App.Div.1956) ("Indeed, equivocalities on a map prepared by an alleged dedicator, not only do not serve to prevent a dedication, but . . . they are, generally speaking, to be resolved against him and in favor of the public body."), *certif. denied*, 23 *N.J.* 140, 128 *A.2d* 309 (1957). Thus, we follow the basic principle that the sale of land with reference to a map that sets forth lots and streets is evidence that the streets are dedicated to the municipality for public use. *Highway Holding Co., supra*, 22 *N.J.* at 125–26, 123 *A.2d* 511.

 Once an owner of land makes an offer of dedication, that offer is "complete and irrevocable so far as the dedicator is concerned." *Cunningham & Tischler, supra*, 15 *Rutgers L.Rev.* at 382, 395. The offer remains in place until the municipality accepts or rejects it, "no matter how long delayed, and these public rights can only be destroyed by proper municipal action, usually by vacation." *Highway Holding Co., supra*, 22 *N.J.* at 126, 123 *A.2d* 511 (citations omitted); *Velasco v. Goldman Builders, Inc.*, 93 *N.J.Super.* 123, 134, 225 *A.2d* 148 (App.Div.1966) ("[T]he power of acceptance continues indefinitely in the public authorities until such time as they reject or vacate the dedicated lands by official municipal legislative action."); *see also Cunningham & Tischler, supra*, 15 *Rutgers L.Rev.* at 410–13 (discussing the vacation of public rights in dedicated lands generally). *N.J.S.A.* 40:67–1b provides that the governing body may "vacate any street, highway, lane, alley, square, place or park, or any part thereof" and may "accept any street, highway, lane, alley, square,

beach, park or other place, or any part thereof, dedicated to public use." In plain language, the governing body may both accept and vacate the dedication of a park. A municipality that wishes to reject a dedication may pass an ordinance to that effect. *See N.J.S.A.* 40:67–19 ("[T]he governing body may by ordinance release and extinguish the public right arising from said dedication....").

Similar to any other taxable land, the owner of unaccepted dedicated land is responsible for the payment of property taxes on that land. *See Point Pleasant Manor Bldg., supra,* 42 *N.J.Super.* at 304–05, 126 *A.*2d 219. Our courts have long noted that taxing dedicated land does not destroy the dedication or the power of acceptance. *See, e.g., Dvorin v. City of Bayonne,* 111 *N.J. Eq.* 52, 57, 161 *A.* 654 (Ch.1932) ("[A]nnual taxation by municipal authorities of land dedicated to public use ... does not create an estoppel against a subsequent acceptance of such dedication."); *Tweddell v. Vill. of S. Orange,* 95 *N.J.L.* 327, 332–33, 112 *A.* 511 (Sup.Ct.1921) (explaining that an original dedication is not lost by "the fact that taxes were assessed on the lands and paid by the owners"). "Thus[,] the collection of taxes on land which has been dedicated to public use will not estop a municipality from later accepting the dedication...." *Cunningham and Tischler, supra,* 15 *Rutgers L.Rev.* at 396.

Nor does the issuance of a tax certificate on the land with an eventual foreclosure change the outcome. The municipality's ability to accept the dedication remains intact. If the matter proceeds to foreclosure and the tax certificate holder acquires title from the delinquent property owner, the municipality continues to retain the right to accept the dedication. Although the value of dedicated land may be minimal, the owner of the land might still benefit from holding the legal title because the municipality may reject the dedication, or once accepted, vacate its acceptance, reverting full control of the land back to the owner. *See State by State Highway Comm'r v. Cooper,* 24 *N.J.* 261, 267–68, 131 *A.*2d 756, *cert. denied,* 355 *U.S.* 829, 78 *S.Ct.* 41, 2 *L.Ed.*2d 42 (1957).

Applying those legal tenets here, the Appellate Division correctly concluded that the Alexanders dedicated the Park lot for public use when it filed the 1929 map and then conveyed other lots with reference to that map. Because the dedicator may not unilaterally revoke dedication, when the Alexanders created the 1938 Agreement, it was too late for them to revoke dedication of the Park lot.

Although the sale of the tax sale certificate and the subsequent foreclosure judgment changed the party who was responsible for paying the taxes, it did not adversely affect the Township's ability to accept the dedication of the Park lot. The Appellate Division correctly rejected defendants' arguments aimed at preventing the Township from accepting the dedication of the Park lot.

## IV.

We turn now to the remedy. Defendants argue that it is unfair and harsh after more than seventy years to permit the Township to accept the offer of dedication and correspondingly allow the Township to keep the money defendants paid for the liens and subsequent taxes. To support their argument, defendants' brief in support of their petition references the "prayer for relief" in the Township's complaint, in which the Township not only sought to have the parcel declared "dedicated," but also sought to have the court fix the amount the Township should pay to "Simon and/or Jerman to reimburse said defendants for the amounts paid on the Tax Sale Certificate and for taxes paid, together with a reasonable interest rate thereon."

Defendants request that this Court consider equitable principles in evaluating the interplay of the law of dedication and our tax sale certificate law to grant them some relief. An example of that approach was considered by the Appellate Division in *Township of Brick v. Vannell*, 55 *N.J.Super.* 583, 151 *A.*2d 404 (App.Div.1959). In *Brick*, the Township sought to enforce a prior declaratory judgment that declared the subject lands dedicated for the use of the public and the school district. *Id.* at 588, 151 *A.*2d 404. The Township wanted "possession of the dedicated tract," including the

houses that had been erected by the Point Pleasant Builders. *Ibid.* As part of its counterclaim, the Point Pleasant Builders sought compensation from the Township for the value of the improvements constructed on the land. *Id.* at 589, 151 *A.2d* 404. In consideration of that request, the panel explained that

> [i]n equity recovery has been allowed in a variety of situations upon varied theories: (1) the equitable maxim that he who seeks equity must do equity; (2) unjust enrichment; (3) estoppel. A *sine qua non*, however, for such relief, in every instance, is the innocence of the improver, *i.e.,* a *bona fide* belief that he is the owner and has a legal right to make the improvements. Absent such a mistake, the improver is deemed to "officiously" confer a benefit and may not recover.
> [*Id.* at 594, 151 *A.2d* 404 (citations omitted).]

The panel held that because the Point Pleasant Builders did not undertake the building operation under a mistake of fact or law, they could not recover. *Ibid.*

In a context outside of dedicated land, courts have used equitable considerations to reimburse property owners whose property is subject to an easement. *See Vill. of Ridgewood v. Bolger Found.,* 104 *N.J.* 337, 340, 517 *A.2d* 135 (1986) (recognizing that "the fair value of property subject to an easement appurtenant is reduced," warranting reduction in valuation of land for tax purposes); *Borough of Englewood Cliffs v. Estate of Allison,* 69 *N.J.Super.* 514, 529, 174 *A.2d* 631 (App.Div.1961) ("[I]t is immaterial for assessment purposes whether the fee owner holds a title subject to a private easement for the benefit of a dominant tenement[or] a public easement in a dedicated and accepted street. . . . In each case the land has been deprived of an element of value to be subtracted from the value of the fee.").

We find those same equitable principles sought to be enforced in *Brick* and enforced in *Ridgewood* and *Englewood Cliffs* applicable here. In the present case, defendants were laboring under a mistake of fact when Jerman and Simon acquired their respective tax sale certificates and when Simon filed the Foreclosure Action because defendants were unaware of the dedicated status of the Park lot. Moreover, the Township did not assess the Park lot as though it were subject to dedication to a

public use. We agree with the Appellate Division's observation that "the assessment of the land must reflect its dedication to a public use, which may result in an assessment for only a nominal amount." *Twp. of Middletown, supra,* 387 *N.J.Super.* at 75, 903 *A.*2d 418. Implicit in that statement is the notion that the Township should have assessed the land at a nominal amount rather than the amount assessed.

We are convinced that Simon and Jerman, as well as the Township, were innocent parties and lacked the requisite knowledge that the Park lot was dedicated property at the time the Township offered and defendants purchased the tax sale certificates on the Park lot. All of the parties acted in good faith through the Foreclosure Action, at which time the issue of dedication first arose. Further, the trial court already had rejected the dedication argument by the time the Township's attorney wrote the March 6, 2003, letter to Simon referring to the 1932 filed map and the designated Park lot.

The Township would be unjustly enriched if we were to recognize the dedicated status of the Park lot and nevertheless enforce the tax assessments on that lot. Certainly, the Township received tax revenues on the Park lot well in excess of the value of the lot as dedicated property. In its complaint, the Township sought to remedy that inequity by asking the court to establish the amount it should reimburse to defendants. That was a fair request. We conclude that a fair and equitable remedy is to bind the Township to its prayer for the court to fix the amount it should reimburse defendants.[2]

---

[2] Unlike our dissenting colleague, we do not find the circumstances sufficient to overcome the general principle that " '[e]quitable estoppel is rarely invoked against a government entity.' " *County of Morris v. Fauver,* 153 *N.J.* 80, 104, 707 *A.*2d 958 (1998) (quoting *O'Malley v. Dep't of Energy,* 109 *N.J.* 309, 316, 537 *A.*2d 647 (1987)). The citizens of the Township have a stake in the dedicated Park lot. We do not find that this case presents such compelling circumstances to support equitable estoppel against the Township, but rather conclude that reimbursement is the appropriate remedy.

In summary, the acceptance of the Park lot as dedicated property by the Township without a corresponding reimbursement to defendants would be an unfair and harsh result that would unjustly enrich the Township. We will not countenance that result. Rather, we apply equitable principles to require the Township to adhere to its prayer to have the court fix an amount it should reimburse to defendants.

## V.

We affirm the judgment of the Appellate Division in part, and reverse in part. We remand to the trial court to fix the amount the Township should reimburse defendants.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

Although the majority's view reaffirming our law of dedication is obviously correct, *ante* at 239–42, 937 *A.*2d at 956–57, a municipality nevertheless must be restrained by the doctrine of equitable estoppel when it engages in a woefully belated attempt to accept a now seventy-eight year old dedication of one of fifty-seven subdivision lots while, in the interim, publicly representing that lot as one unencumbered by any dedication. Therefore, the judgment of the Appellate Division should be reversed, and the judgment of the Chancery Division dismissing the municipality's declaratory judgment action seeking title to the property should be reinstated. Because the majority does not reach that result, I respectfully dissent.

## I.

In large measure, one cannot quarrel with the even-handed factual presentation made by the majority. There are, however, a few salient facts that warrant focused attention.

The majority correctly points out that, during the pendency of a tax sale certificate foreclosure action brought by defendant (then

plaintiff) Richard Simon against the record title holders in 2000, counsel for the then-nonparty but now-plaintiff Township of Middletown wrote to Simon's counsel, raising the question of whether the lot at issue was dedicated for use as a park and inquiring as to a possible settlement. Simon's response was direct and unequivocal: the trial court already had rejected the claim that the lot was dedicated property and, hence, Simon had no interest in exploring any settlement. The Township's subsequent and lengthy silence in the face of Simon's response was deafening and, in the end, condemning.

Despite that representation by Simon, the Township made no effort to intervene in the 2000 tax sale foreclosure action in order to press its claim to the lot. Even more tellingly, as the majority correctly notes, no one appealed the trial court's final judgment of foreclosure in Simon's favor in the 2000 tax sale certificate foreclosure action. The Township's sole response came a year later, when it "request[ed] that Simon consider the sale of the Park lot to the Township." *Ante* at 235, 937 *A*.2d at 953. Again, Simon demurred, this time because Simon already had contracted with a buyer for the lot.

The Township's historical handling of this lot is entirely inconsistent with the position it now advances. It treated the lot as privately owned; it taxed the lot for any number of years; it sold tax sale certificates to recoup the unpaid taxes on the lot; it accepted the payment of current real estate taxes on the lot from Simon; it informally asserted a claim to the lot and was told that the court in the 2000 tax sale certificate foreclosure action had determined that the Township had no title interest in the lot; it failed to intervene in that action to assert the title claims it now asserts; it failed to appeal that court's final judgment of foreclosure issuing title to Simon; and it again made an overture to purchase the lot from Simon and was rejected because the lot was already subject to an agreement of sale to a third party. Most importantly, the Township acted in a manner utterly and irretrievably inconsistent with its present claims: it issued a building

permit for this lot that authorized private construction on it, a use clearly anathema to the Township's tardy assertion that the lot had been dedicated exclusively for use as a park.[1]

Finally, although unspoken in the majority's recitation of the facts, it is important to focus on the inescapable conclusion that the Township's present declaratory judgment action was not the result of its own volition. After all, it had consistently and unalterably held the view that the lot was privately owned, had been properly taxed, had been properly the subject of Township-issued tax sale certificates, had been properly the subject of a foreclosure action in which the Township had no interest, and that title to the lot properly had passed, by judicial judgment, to Simon. The Township's present declaratory judgment action is not one of a wronged party; it is the product of public pressure resulting from the hue and cry raised by the neighbors to the lot, two of whom intervened as party-plaintiffs.

---

[1] The majority correctly notes that Simon did not own the property when this building permit was issued. However, it misapplies that fact to discount the import of the issuance of the building permit, an overt act by the Township. According to the majority, "[b]ecause [Simon] did not own the property in 1996 when the permit was issued, we find no basis to use that as a factor in considering [Simon's] equitable estoppel argument." *Ante* at 239 n. 1, 937 A.2d at 956 n. 1.

That focus is misplaced. The issues here are linear: first, how did the Township overtly treat the property and, second, did Simon reasonably rely on those representations? Couched correctly, then, whether Simon owned the property when the building permit was issued is, simply put, irrelevant. As a threshold matter, what are relevant in the equitable estoppel context are the Township's—and not Simon's—acts. Among those acts, the Township indisputably issued a building permit, an act entirely contrary to the Township's assertion that it retained a seventy-plus year right of dedication to a property for which it authorized construction by a private party. Once those representations are ascertained, the focus shifts to Simon's reliance on those representations and whether that reliance was reasonable. In this regard the record also is clear: the issuance of this building permit loomed large when Simon conducted a lien search of the property *before* he acquired title by foreclosure. In short, the Township, in word and deed, consistently and unequivocally represented that the property was unencumbered by a dedication and it is to those representations that the Township should be bound.

## II.

As an overarching proposition, it is fitting and proper to sustain a municipality's right to accept the dedication of realty for the benefit of its citizens. It has long been the rule that a dedication—"the permanent devotion of private property to a use that concerns the public in its municipal character," *Black v. Central R.R. Co.*, 85 *N.J.L.* 197, 202, 89 *A.* 24 (E. & A.1913)—is not transitory. It also has long been the rule in this State that if "there is a dedication ... to the public ... such dedication continues and cannot be revoked except by consent of the municipality." *Highway Holding Co. v. Yara Engineering Corp.*, 22 *N.J.* 119, 125–26, 123 *A.2d* 511 (1956) (citations omitted). *Accord Englander v. W. Orange Twp.*, 224 *N.J.Super.* 182, 189, 539 *A.2d* 1271 (App.Div.1988) (explaining that "the fact that the land has never been formally accepted (by the enactment of an ordinance) ... by the municipality[ ] is inconsequential because such dedication is irrevocable except by proper official municipal action" (citations and footnote omitted)); *Velasco v. Goldman Builders, Inc.*, 93 *N.J.Super.* 123, 134, 225 *A.2d* 148 (App.Div.1966) (noting that, although a "dedication may never be accepted ... the power of acceptance continues indefinitely in the public authorities until such time as they reject or vacate the dedicated lands by official municipal legislative action" (citations omitted)).

In the end, however, that conclusion and the reasoning that undergirds it are irrelevant here. No doubt, the acts of the original grantor in 1929 were sufficient to "dedicate" this lot as parkland for public purposes. Moreover, although the Township never *formally* accepted or rejected that dedication in a timely manner, the cloud of dedication nevertheless hovered over that lot. The question presented, then, is not whether the lot was dedicated to the Township or whether the Township accepted or rejected that dedication. The true question here is whether the Township acted in a manner sufficiently inconsistent with the character of the lot as a public park to invoke the doctrine of equitable estoppel

and thus bar the Township's belated attempt to accept the dedication.

## III.

The doctrine of equitable estoppel also is of long-standing. We have explained that "[t]he essential principle of the policy of [equitable] estoppel ... is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct." *Summer Cottagers' Ass'n of Cape May v. City of Cape May*, 19 *N.J.* 493, 503–04, 117 *A.2d* 585 (1955). Stated differently, "to establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." *Knorr v. Smeal*, 178 *N.J.* 169, 178, 836 *A.2d* 794 (2003) (citation omitted). *See also Heuer v. Heuer*, 152 *N.J.* 226, 237, 704 *A.2d* 913 (1998) (defining equitable estoppel as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse ...." (citations and internal quotation marks omitted)).

Ironically, in a case involving this same Township, we held that although "[e]quitable estoppel is rarely invoked against a governmental entity[,] ... equitable estoppel will be applied in the appropriate circumstances unless the application would prejudice essential governmental functions." *Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown*, 162 *N.J.* 361, 367, 744 *A.2d* 649 (2000) (citations and internal quotation marks omitted). We explained that "before an evaluation of the equitable considerations in applying equitable estoppel [against a governmental entity] may take place, an examination of the nature of the governmental action is required." *Id.* at 368, 744 *A.2d* 649

(citation omitted). In doing so, we distinguished between "wheth-er the conduct is *ultra vires* in the primary sense, or *ultra vires* in the secondary sense[,]" *ibid.*, that is, we acknowledged

a distinction between an act utterly beyond the jurisdiction of a municipal corpora-tion and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are *ultra vires* in the primary sense and void; the latter, *ultra vires* only in a secondary sense which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice.

[*Ibid.* (quoting *Skulski v. Nolan*, 68 *N.J.* 179, 198, 343 *A.2d* 721 (1975) (citation and internal quotation marks omitted)).]

It cannot be a matter of serious contest whether the Township's actions here were anything other than *ultra vires* in the secondary sense: the Township clearly had the power to accept the dedica-tion of the lot, but it did not. In that basic context—and, again, involving this same Township—we have held that "[a]ctions that are *ultra vires* in the secondary sense will permit the application of estoppel." *Ibid.*

A straightforward application of the principles of equitable estoppel inexorably yields the conclusion that the Township must be bound to act in a manner consistent with how it acted until it responded to public pressure. Up to that point, the Township treated this lot as private property: it maintained the lot on the rolls of taxable property; it taxed it; it sold tax sale certificates to recoup the outstanding taxes on the lot; although on notice, it failed to assert its interests in the lot and to intervene in a foreclosure proceeding, the sole purpose of which was to vest clear and marketable title in Simon; it allowed the entry of a judicial judgment of foreclosure concerning the lot in Simon's favor; it failed to appeal that judgment; and it issued a building permit allowing construction on that lot.[2] Thus, the Township's actions

---

[2] The Township argues that, in respect of the tax sale certification process, its failure to treat this lot as encumbered by a dedication was of no moment. Even if one accepts that proposition—and one cannot—the Township cannot rebut the commonsense notion advanced by Simon: that the issuance of "a private building permit with respect to the [lot constitutes] an act completely incompati-ble with any notion that the [lot] would remain vacant as a 'park.'"

abundantly satisfy the doctrine's first prong: that the Township "engaged in conduct, either intentionally or under circumstances that induced reliance[.]" *Knorr, supra,* 178 *N.J.* at 178, 836 *A.*2d 794.

The same result obtains in respect of the doctrine's second prong of whether Simon, in reasonable reliance on the Township's actions, "acted or changed [his] position to [his] detriment." *Ibid.* Again, the record is consistent, clear and undisputed: Simon purchased the tax sale certificates sold by the Township; he paid and has continued to pay the intervening real estate taxes; he timely sought judgment of foreclosure; he successfully litigated whether the Township had a continuing or residual interest in the lot; and he sold the lot to a third party in an arm's length transaction. In these multiple efforts, Simon obviously expended considerable time, effort and money in reasonable reliance on the Township's actions.

In sum, the Township's failure to accept the dedication of the lot was ultra vires in the secondary sense. Also, the Township acted in a manner that induced reliance in Simon as to whether the lot was encumbered by any such dedication. Finally, Simon reasonably relied to his detriment on the Township's multiple and consistent representations concerning Simon's ability to acquire unencumbered fee title to the lot. That pattern presents a textbook example of when the doctrine of equitable estoppel should be invoked to rein in capricious governmental actions. Because the majority does not do so, I respectfully dissent.[3]

[3] It is plainly impractical to conclude that a businessman such as Simon—whose acumen and expertise in the arena of tax sale certificates is well known to this Court, *see, e.g., Simon v. Cronecker,* 189 *N.J.* 304, 915 *A.*2d 489 (2007); *Simon v. Rando,* 189 *N.J.* 339, 915 *A.*2d 509 (2007)—would exert all of the efforts he did if the Township were to retain the right to simply pull the rug out from under him at any time by accepting the dedication of the lot. Yet, that is the very conclusion advanced by the majority. *Ante* at 241, 937 *A.*2d at 957. In light of the majority's conclusion that Simon was an "innocent part[y]" who "acted in good faith[,]" *ante* at 245, 937 *A.*2d at 959–60, this presents another reason I cannot join in the majority's analysis.

## IV.

The majority does remand the cause for the fixing of an appropriate remedy. The majority concludes that "the acceptance of the Park lot as dedicated property by the Township without a corresponding reimbursement to [Simon] would be an unfair and harsh result that would unjustly enrich the Township." *Ante* at 246, 937 *A.*2d at 960. For that reason, the majority binds the Township to its original prayer for relief and remands the matter "to fix the amount [the Township] should reimburse [Simon]." *Id.* at 246, 937 *A.*2d at 960. Again, I cannot agree.

In light of the Township's actions, the only fair and proper remedy is payment to Simon for that which the Township is taking from Simon: the fair market value of the property as improved. If, in the context of its long-standing treatment of this lot, the Township had proceeded along the legally and equitably correct course—under the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –47—the Township would have had to condemn the lot for the creation and maintenance of a park, that is, "to take private property for a public purpose under the power of eminent domain[,]" *N.J.S.A.* 20:3–2(a), in exchange for "the fair market value of such property." *N.J.S.A.* 20:3–6. Those damages are far in excess of the miserly restitution damages allowed by the majority.[4] Thus, in respect of the remedy afforded by the majority, again I respectfully dissent.

---

[4] As a remedy, restitution is woefully insufficient in these circumstances. As a matter of law, all restitution does is to "restore[ ] the innocent party to the condition he or she occupied before the contract was executed." *Totaro, Duffy, Cannova and Co., L.L.C. v. Lane, Middleton & Co., L.L.C.,* 191 *N.J.* 1, 12, 921 *A.*2d 1100 (2007). *See also Mt. Laurel Twp. v. Mi-Pro Homes, LLC,* 188 *N.J.* 531, 538 n. 2, 910 *A.*2d 617 (2006) (Rivera–Soto, J., dissenting) (explaining that restitution is limited to "an award of compensatory damages [that] requires the full restoration or 'restitution' ... of all payments made." (quoting *Material Damage Adjustment Corp. v. Open MRI of Fairview,* 352 *N.J.Super.* 216, 232, 799 *A.*2d 731 (Law Div.2002) (internal quotation marks omitted))). Yet, requiring that the Township only pay restitution damages for the Township's undisputed wrongful acts rewards the Township for its dilatory and inconstant behavior; it is required

## V.

For the foregoing reasons, I must respectfully concur in part and dissent in part.

*For affirmance in part/reversal in part/remandment*—Chief JUSTICE RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, and HOENS—6.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.

to pay only that which Simon expended, thereby effectively confiscating without just compensation the efforts Simon brought to bear in this enterprise.